FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

98 MAR 31  PH 4: 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILLIAM STEVEN SPRINKLE and       }
DONNA SPRINKLE,                   }
                                  }
        Plaintiffs,               }
                                  }
v.                                }        CASE NO. CV 96-B-2666-NW
                                  }
REYNOLDS METALS COMPANY,          }
                                  }
        Defendant.                }

ENTERED

MAR 3 1 1998

## MEMORANDUM OPINION

Currently before the court is the motion of defendant Reynolds Metals Company

("Reynolds") for partial summary judgment. Plaintiffs William Steven and Donna Sprinkle

("Steve" and "Donna," respectively)[1] brought this action alleging violations of their rights

under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2653, and

Alabama state law claims of intentional infliction of emotional distress and invasion of

privacy. The plaintiffs have filed a Motion to Dismiss their FMLA claims with prejudice.[2]

Reynolds's Motion for Partial Summary Judgment concerns all of the remaining claims. Upon

consideration of the record, the submissions of the parties, the argument of counsel, and the

relevant law, the court is of the opinion that the motion is due to be granted and the plaintiffs'

_____

[1] For ease of reference only, the court refers to William Steven Sprinkle and Donna
Sprinkle as "Steve" and "Donna," respectively. It is not the court's intention to be disrespectful
in any way.

[2] The court will enter a separate order granting this Motion to Dismiss.

-1-

claims are due to be dismissed with prejudice.

## I. FACTUAL SUMMARY[2]

Steve and Donna Sprinkle are husband and wife. Compl. at ¶ 1. Steve has been employed at Reynolds's Sheffield Plant since January 12, 1987. Steve Dep. at 10. He has been represented by the carpenters union for approximately the past ten years of his tenure at Reynolds. *Id.* at 11. About 120 persons are employed at the Sheffield Plant where John Miniclier has been the business development manager since 1991. Miniclier Dep. at 36, 110.

Donna Sprinkle has never been employed by Reynolds. Donna Dep. at 12. She was diagnosed with fibromyalgia[4] in 1993, interstitial cystitis of the bladder[5] around 1988 to 1990, and endometriosis[6] around 1989. *Id.* at 48-50, 69, 75-76. Both the endometriosis and interstitial cystitis have required surgery. *Id.* at 72, 77-79. Donna has been treated for

---

[2] The court draws all reasonable inferences in favor of the nonmoving parties, Donna and Steve Sprinkle, when considering a motion for summary judgment.

[4] Donna describes fibromyalgia as "a condition of your muscles, tendons and ligaments. It makes you fatigued. It can cause depression because you're in chronic pain." *Id.* at 48.

[5] Donna describes her interstitial cystitis as follows:

My bladder can't hold as much as a normal person's bladder. I have to go to the bathroom maybe sixty to seventy times a day during bad flare-ups. When the bladder gets more than, say, a fourth of a cup full it will start cracking and bleeding and it also spasms.

*Id.* at 70-71.

[6] Donna describes endometriosis as "a condition where you have tissue growing outside the uterus. It attaches itself to the ovaries, whatever it can attach to." *Id.* at 75. In Donna's case, her "uterus was pulled over to completely to one side because of the endometriosis and the scar tissue." *Id.*

fibromyalgia with trigger point injections which involve direct injections of medicine into affected areas. *Id.* at 53-56. On several occasions, Steve has had to either stay home or return home from work to care for Donna and take her to the doctor's office for treatment. *Id.* at 68-69, 74-75.

Steve learned about the FMLA during the spring or early summer of 1994. Steve Dep. at 18, 303. In June 1994, he asked Dr. Paul Perry, Donna's primary physician, for a medical excuse letter so Steve and Donna could take a beach vacation. *Id.* at 34, 49-50. Dr. Perry provided a letter dated June 20, 1994, with the following text:

> Ms. Sprinkle has chronic pain from fibromyalgia and it is my recommendation that she decrease her activity and stress by taking a vacation to the beach in July. The dates she has scheduled are July 7th through the 16th and I do feel that this is certainly medically advantageous.
>
> Any courtesies extended to Ms. Sprinkle would be appreciated, and should you have any further questions, please contact this office.

*Id.* at Ex. 5. According to Dr. Perry, no particular medical reason dictated July 7-16 as the time period for this vacation. Perry Dep. at 23. He felt that the vacation would be "medically advantageous" because it would decrease Donna's activity and stress, not because it was medically necessary or essential. *Id.*

Steve decided not to submit Dr. Perry's letter because he felt that he "would be turned down on a leave on a — on my leave of absence for vacation." Steve Dep. at 49. On June 23, 1994, he spoke with an unidentified "girl" in Dr. Perry's office and asked if the letter could be reworded without the word "vacation." *Id.* at 37-38, 49. That same day, Steve allegedly received a "Fax Transmittal Sheet" from Dr. Perry's office that was signed by Tammy Perrin and contained the following typewritten "message":

-3-

Mrs. Sprinkle has chronic pain from fibromyalgia and it is my recommendation that she be out of town from July 7, through July 16th for treatment of this condition. I do feel like this is certainly advantageous.

Any courtesies extended to Mrs. Sprinkle would be appreciated and should you have any further questions, please contact this office.

*Id.* at 28, 34, Ex. 3 (fax transmittal from Dr. Perry's office dated June 23, 1994). [2] Steve assumed that this fax transmittal was authorized by Dr. Perry. Steve Dep. at 37-38.

On June 30, 1994, Steve submitted a Request for Family Medical Leave. *Id.* at Ex. 4 (Request for Family Medical Leave). Citing "Serious Health Condition of Spouse," he sought leave for July 7-18, 1994 and provided the following explanation: "My wife has a condition of the muscles in her back, legs [and] arms, has to have a special treatment program to try and get the muscles to relax [illegible word] out of spasms." *Id.* Steve testified that the "condition of the muscles" referred to fibromyalgia. *Id.* at 20-21. He attached the fax transmittal from Dr. Perry's office dated June 23, 1994. *Id.* at 28.

Dickie Sanderson, senior labor relations representative for the Sheffield Plant, reviewed the leave request with the fax attachment and approved it. Sanderson Dep. at 10, 31,

---

[2] Because all reasonable inferences are drawn in favor of the plaintiffs, the court assumes the fax transmittal was authorized by Dr. Perry and is authentic. However, these assumptions are far from undisputable. Upon inspecting a copy of the transmittal, there exists a noticeable difference in the print quality between the typewritten "message" section and the rest of the transmittal. *See* Steve Dep. at Ex. 3. This disparity could give rise to the inference that the message section was typed *after* the fax was received. Additionally, the transmittal identifies itself as one of two pages transmitted although only one sheet was submitted by Steve. *See id.* Finally, no one at Dr. Perry's office can confirm that the "message" in the transmittal originated from that office. Dr. Perry has no recollection of revising his earlier letter of excuse. Perry Dep. at 21. While she does not recall what she sent to the Sprinkles, Tammy Perrin, who signed the transmittal, has testified that "I handwrote the fax sheets. I never typed them." Perrin Dep. at 15. She believes for certain that no one in the office could have typed the "message" on the transmittal because she was the only dictation transcriptionist in the office. *Id.* at 18.

-4-

54-55. Sanderson never spoke to Steve before approving the request, but he assumed, based on Steve's submission, that Donna had to have "a special treatment program to try and get [her] nerves to relax and out of spasm." *Id.* at 55. Steve considers a vacation a "special treatment program" and justifies this interpretation with references to a fibromyalgia brochure which includes vacations as treatment for the condition. *See* Steve Dep. at 41-42; Donna Dep. at 99.

Steve took leave July 7-18, 1994 and returned to work around July 20, 1994. Steve Dep. at 28, 32-33. During that period of time, Steve and Donna, along with their two children and possibly Donna's parents, went to Panama City, Florida. *Id.*; Donna Dep. at 23-27. According to Donna, the Sprinkles try to go to the beach in Florida every summer. Donna Dep. at 25. During the 1994 trip, Donna admits their activities entailed "[j]ust relaxing, sleeping and lying on the beach." *Id.* at 26. Steve concedes that they did not see any doctors during their stay at Panama City; he testified that Donna received the following "medical treatment": "Except for the myofascial release and physical therapy that I had to do on her, plus the reason for [the vacation] is to reduce the stress and we was going through a hard time." Steve Dep. at 33-34.

Steve first encountered criticisms about his work attendance in November 1994. *Id.* at 15. On November 5, 1994, Steve had an automobile accident and subsequently missed several days. *Id.* at 265. Miniclier called Steve into his office on November 8, 1994 to discuss Steve's absenteeism. Miniclier Dep. at 147-48. Steve attributed his absences to the accident and taking care of his family and he asked for additional time off for his wife's upcoming surgery. *Id.* at 148-49.

-5-

Miniclier's meeting with Steve spurred Miniclier to contact Reynolds's labor relations department. Miniclier Dep. at 146-47. Sanderson claims that Miniclier approached him about an "absentee problem" regarding Steve. Sanderson Dep. at 56-58. Miniclier had never heard of the FMLA prior to November 1994. Miniclier Dep. at 69. He believes the twelve weeks of leave allotted by the FMLA is excessive. *Id.* at 102. Sanderson and Miniclier reviewed Steve's attendance record and noted an "established pattern to some degree that [Steve] was taking off in conjunction with his off days." Sanderson Dep. at 63-64. Miniclier also claimed to have information that Donna had not received medical treatment during Steve's July 1994 leave. *Id.* at 65. Miniclier asked Sanderson to confirm this information. *Id.* at 66-67. After his meeting with Miniclier, Sanderson asked Marty Maxie in the Reynolds insurance department to verify whether Dr. Perry's office had, in fact, sent the fax transmittal dated June 23, 1994, and to contact the company insurance carrier to determine if Donna had filed a claim for medical treatment during the dates of Steve's leave. *Id.* at 69. Maxie subsequently informed Sanderson that Dr. Perry had sent the document but no insurance claim had been filed on the dates in question. *Id.* at 69-70. The labor relations department concluded that Steve's family medical leave request had been falsified. *Id.* at 81. Sanderson made the decision to suspend Steve. *Id.* at 93.

Steve Sprinkle met with Miniclier and representatives from his union around mid-November 1994. Steve Dep. at 39-40; Lewey Dep. at 7, 23. Miniclier accused Steve of lying and forging the faxed excuse note from Dr. Perry's office. Steve Dep. at 39-40; Lewey Dep. at 12, 23. Miniclier claimed the state troopers in Florence denied working on an accident

-6-

involving Steve. Steve Dep. at 265-66.[1] Miniclier also claimed that Donna's doctor denied
that Donna was ill. *Id.* at 265. Steve denied these accusations[2] but was suspended subject to
discharge, "pending investigation" for "giving false reasons for being off." Steve Dep. at 30,
40-44, Ex. 6; *see also* Lewey Dep. at 25. Steve met again with Miniclier and a union
representative the following day. Steve Dep. at 44. Steve gave Miniclier documents from his
health insurer dating back to 1989, a brochure about fibromyalgia, and the letter from
Dr. Perry dated June 20, 1994. *Id.* at 44-48. Sanderson admits that he never verified if the
myofascial release that Steve performed on Donna qualifies as "special treatment" for
fibromyalgia or whether such a procedure requires special training. Sanderson Dep. at 82-83.

During his suspension, Steve was in contact with his union which filed grievances and
held grievance meetings with management on his behalf. Steve Dep. at 58; Thomas Dep. at
20-21. On December 8, 1994, Steve, along with representatives from his union and Reynolds,
signed a "Memorandum of Agreement" which ended his suspension and authorized his return
to work on December 12, 1994. Steve Dep. at Ex. 7. The Memorandum states:

> Mr. Sprinkle acknowledges that he was properly suspended for violation
> of Plant Conduct Rule No. 6 ["Falsification of personnel, or other Company
> records or giving false information to any person preparing such records"]. All
> time lost from November 15, 1994 until his return to work will serve as a
> disciplinary layoff. Mr. Sprinkle's reinstatement will be without back pay, but
> no loss of seniority or other benefits.

---

[1] According to Steve, state troopers from the Florence office did not work on the accident
because it occurred in Lawrence County which is covered by state troopers from Morgan County.
Steve Dep. at 266.

[2] Miniclier asserts that Steve "admitted that he did not have a letter from Dr. Perry that
referred his wife for treatment." Miniclier Dep. at 192. Steve's union representatives both
confirm that Steve made no such admission. Thomas Dep. at 45; Lewey Dep. at 25-26.

*Id.* at Ex. 7 (Memorandum of Agreement). Steve claims that he did not want to admit any wrongdoing but felt that he had no choice because he was told, "Either you sign this or you don't have a job." *Id.* at 60-64.

Reynolds has a system of "progressive discipline" system for absenteeism where the severity of discipline increases with each successive violation (i.e., warning, three-day suspension, five-day suspension, and discharge). *Id.* at 246. After returning to work, Steve missed four hours of work on December 21, 1994 and two full days of work on December 22 and 23, 1994. *Id.* at 189-196. According to Steve, his job was shut down on December 21, 1994 and he apparently assumed that he was not needed on the following two days. *See id.* at 192-96. Steve explains that he spent these days caring for his wife who had just undergone surgery. *Id.* at 195-96. Consequently, Steve was disciplined with a first offense warning slip for "Excessive Absenteeism." *See id.* at Ex. 14.

Around January 1995, Steve completed and signed, but did not date, another Request for Family and Medical Leave form. *Id.* at 72. He again cited "Serious Health Condition of Spouse" as his reason for the request. *Id.* at Ex. 8 (Request for Family and Medical Leave). However, he only wrote "N/A" for both the duration of the leave and date of return because "fibromyalgia is a flare-up kind of thing" and is unpredictable. *Id.* at 68, Ex. 8. He provided the following explanation on the form:

> My wife suffers from fibromyalgia and interstitial cystitis of the bladder, also chronic pelvic pain caused from indometrosis [sic]. These diseases require frequent trips to Birmingham, Alabama, to her doctors for physical therapy and trigger point injections. This is an uncurable [sic] condition that will be present for her lifetime. Medical records available upon request.

-8-

*Id.* at Ex. 8. Steve submitted this form to his job stewards. *Id.* at 73. Steve's request was rejected on the grounds that "the right form had not been filled out" even though he had twice been given (and twice completed) the same form. *Id.* at 75-76.

On February 8, 1995, Steve received a three-day "2nd offense" suspension for "Excessive Absenteeism." *Id.* at Ex. 15. He had missed an unspecified number of days due to bronchitis, flu, and pneumonia. *Id.* at 201. He also missed additional days to care for his wife and drive her to her treatments. *Id.* at 203-04. He served his suspension on March 8, 11, and 12, 1995. *Id.* at 199, Ex. 15.

On March 30, 1995, Steve received a five-day "3rd offense" suspension. *Id.* at 204, Ex 16. When he received this suspension, Steve asserts that Miniclier threatened to fire him by saying, "[T]his is five days and I guess you know what the damn next step is." *Id.* at 204. George Taramangos, a general supervisor, allegedly told him "it's just to let you know that we're still watching you." *Id.* at 312; Pls.' Evid. Ex. 10 (Horton Decl.). Again, Steve claims that he missed an unspecified number of days to care for his wife. Steve Dep. at 205. He served his suspension from March 31 to April 6, 1995.

On Steve's behalf, the union filed grievances protesting both suspensions and demanding compensation for lost wages. *Id.* at 205-06, Exs. 17, 18 (Industrial Grievance Forms). The grievances stated that Steve's absences were excused and covered by the FMLA because they were due to either his own illness or illness in his family. *Id.* Miniclier asserts that the suspensions were appropriate because the personnel department had not granted Steve's family leave requests. Miniclier Dep. at 237-38, 245-46. Steve maintains, "[W]e met

two or three times" before [the five-day suspension] to fill out [FMLA requests] and they never gave me the right form, and never told me about the law. They didn't even have the law posted." Steve Dep. at 211; *see also* Sanderson Dep. at 48-50. In fact, Steve had filled out the right form but had not attached the requisite Certification of Health Care Provider form because no one gave him this form or told him about it. Steve Dep. at 212-13.

At the time, Sanderson was responsible for granting FMLA requests. Sanderson Dep. at 135. Sometime in the spring of 1995, Sanderson telephoned Dr. D.A. Shanahan, Reynolds's medical director, and explained that Reynolds "was trying to determine what reasons Mr. Sprinkle was being off work" and asked him to see "if he could find out anything about a need for [Steve] to be with his wife when she was going to Birmingham [for treatment]." Sanderson Dep. at 130-31. Dr. Shanahan subsequently wrote a letter to Dr. Perry dated April 10, 1995, containing the following language:

> Our Industrial Relations Department has asked me to write you for an update and an opinion as to the condition of Mrs. Donna Sprinkle and the necessity of her husband being in such constant attention to her while she undergoes treatment. The Company feels that his absences are of concern and wish to determine that they are, in fact medically approved and indicated as would be necessary under the various acts for absence under Federal Law. What I am looking for is just a brief statement regarding her medical condition, her necessity of treatments and the prognosis for future necessity of her husband being the one in attendance to her.

Steve Dep. at Ex. 12. Including a copy of Steve's Request for Medical Leave, Dr. Shanahan added, "I would understand that with the signed request here that this would indicate a release for medical records permission." *Id.*[10] In a letter dated April 17, 1995, Dr. Perry responded:

---

[10] The signed Request offered, "Medical records available upon request." *Id.* at Ex. 8.

-10-

Donna Sprinkle has been diagnosed with Fibromyalgia. She has frequent flareups requiring trigger point injections, physical therapy and frequent evaluations with medical control.

Living some distance from our office, she is unable to drive after her therapy. Therefore, someone must be in attendance with her when she has therapy. Her prognosis is guarded due to the unpredictable nature of fibromyalgia progression.

It is certainly true that Mr. Sprinkle has been in attendance with his wife during her treatments.

*Id.* at Ex. 13. Dr. Perry added, "Please let me know if I can be of further service." *Id.* Copies of these letters were sent to Sanderson. Sanderson Dep. at 132, 137. Notwithstanding this exchange of letters, Sanderson admits that he still did not grant family medical leave for Steve. *Id.* at 138. He claims that nothing in the letter "substantiates any need for Mr. Sprinkle to be granted medical leave" because the letters do not say he *had* to be in attendance for Donna's treatments. *Id.* Sanderson concedes that he neither told Steve nor told anyone to tell Steve that he needed a doctor's letter stating the necessity of his presence at Donna's treatments. *Id.* at 138-39.

Around April 1995, Steve went "crying and begging" to Miniclier for a "leave of absence for my mental state." Steve Dep. at 164. Miniclier directed Steve to speak with labor relations officer John Norris. *Id.* Steve followed Miniclier's directions and told Norris that "all the stress and stuff" had put him on "the verge of emotional breakdown." *Id.* After Norris told him that "he would take care of everything," Steve left work. *Id.* at 165. Steve later called work and "the foreman was screaming" at him. When Steve called Miniclier, Miniclier told him that Miniclier couldn't help him and the "best thing I can say is make it the best way you can and that's all I can do for you." *Id.* at 165-66. Donna then called Dr. Perry who

-11-

referred Steve to Dr. Alastair Guthrie, a psychiatrist in Birmingham. *Id.* at 166, 281-82.

At the psychiatrist's direction, Steve reported sick for at least thirty days before returning to work. *Id.* at 166-67. Beginning in April 1995, Steve consulted Dr. Guthrie about four or five times, received medication, and was sent to a psychologist for tests. *Id.* at 281-84. Dr. Guthrie diagnosed him as having an "[a]djustment disorder with mixed emotional features." Pls.' Evid. Ex. 11 (Steve's History & Physical Sheet and/or Progress Note Record at Lloyd Noland Hospital). Steve has also entertained violent thoughts or made statements about violence towards Miniclier. *See id.*; Steve Dep. at 255-57. Steve claims to have been suicidal and blames his condition on Miniclier's "[h]arassment, pressure, just constant intimidation." Steve Dep. at 290. For insurance reasons, Steve eventually switched psychiatrists in the fall of 1996 to Dr. Susan Burnell, who prescribed additional medication. *Id.* at 285-88. Dr. Tom Moore, a psychologist and assistance program coordinator for Reynolds, recommended Dr. Burnell and also counseled Steve and performed tests on him. *Id.* at 281, 288-90.

On June 23, 1995, Steve attended a "second step" meeting concerning his grievances after his grievances were initially denied. *Id.* at 215; Lewey Dep. at Ex. 4 at 6 (memorandum from Sanderson summarizing June 23, 1995 meeting). During the meeting, the parties discussed several matters including the location of Donna's doctor and the coding of Steve's absences as "personal business" instead of "family sickness" on his time sheets, a practice which ceased after the meeting. Steve Dep. at 215-220; Lewey Dep. at Ex. 4 at 6. Additionally, Steve was given the Certification of Health Care Provider form which Reynolds allegedly required for FMLA requests. *Id.* at 91-92; Lewey Dep. at Ex. 4 at 6.

-12-

On August 1, 1995, Steve submitted another FMLA request with the Certification attached. *Id.* at 77-78, 92-94. Later that month, Steve attended a meeting with representatives from his union and Reynolds where Reynolds offered to grant the leave request, "clean up" Steve's disciplinary record, and pay him for the eight days he had been suspended if he "would sign a form saying that everything that had been done was history." *Id.* at 94, Ex. 19. After discussing the offer with his union representatives, who advised him to agree to it, he said he would show it to his attorney. *Id.* at 94-103. At this point, Sanderson said no attorney would see the document and "snatched" the paper out of Steve's hands. *Id.*

The parties met again the next day. *Id.* at 104-05. That meeting started with Sanderson saying "they were apologizing for any inconvenience to my family or me" and Miniclier saying "he didn't mean any harm to me and my family." *Id.* at 106-07. Steve was given permission to take Donna to the doctor on the condition that he provide a medical excuse note each time. *Id.* In a letter dated August 18, 1995, Reynolds's rendered its formal reply to Steve's grievances:

> Per our agreement on August 17, 1995, [Reynolds] agrees to withdraw the discipline slips issued to Mr. Sprinkle on 12/19/94, 2/8/95 and 3/30/95, and pay him eight days at the straight time for those days on which he otherwise would have worked.

*Id.* at Ex. 19; *see also* Lewey Dep. at Ex. 4 at 6.

During the August 17, 1995 meeting, Sanderson also informed Steve that the FMLA request he had submitted earlier in the month could not be granted because the FMLA required at least 1,250 hours of work during the twelve months prior to the request. Lewey Dep. at Ex. 4 at 6. Steve had never been told that the 1,250-hour requirement was a reason for

-13-

rejection of his previous requests. Steve Dep. at 91-92. He turned in another request for

family medical leave later in the month. *See id.* at 108. A document dated September 5,

1995, notified Steve that his request was granted. *Id.* at 107-08.

Steve alleges that his superiors at Reynolds, namely Miniclier, have engaged in a

campaign of harassment since November 1994. In addition to the allegations already stated in

this Factual Summary, the plaintiffs claim to have endured the following harassment:

1. Rumors that Steve had forged a letter from Donna's doctor. *See* Steve
   Dep. at 258-60; Pls.' Evid. Ex. 10 (declarations of coworkers attesting
   to rumors that Steve forged a letter from Donna's doctor).

2. Accusations and rumors that Steve had caused a secretary in Dr. Perry's
   office to be fired for sending a forged letter. *See* Steve Dep. at 130,
   134, 258-60, 345-46; Pls.' Ex. 10 (declaration that Steve caused a
   doctor's secretary to be fired); Lewey Dep. at 14, 47.

3. Accusations and rumors that Steve had lied about Donna's medical
   condition. *See* Pls.' Ex. 10 (declarations that Donna was not suffering
   from a serious illness); Steve Dep. at 131, 133, 145, 258-60.

4. Claims that fibromyalgia is not a serious condition. Steve Dep. at 361-62.

5. Miniclier constantly called meetings where he was demanding,
   slapped his desk, threw papers, screamed, and called Steve a liar,
   a fraud, and a forger. *Id.* at 258-60, 264-65; Thomas Dep. at
   13; Lewey Dep. at 33, 54.

6. Blame for impairing Miniclier's ability to maintain discipline at the
   plant. Steve Dep. at 248; Miniclier Dep. at 252-53; Lewey Dep. at 57.

7. Threats of discharge for Steve's absenteeism. Steve Dep. at 77, 204, 248.

8. Accusations that Steve had a friend call Miniclier and pretend to be
   Dr. Perry. *Id.* at 116-17.

9. Accusations that Steve's automobile accident "never happened." *Id.* at 145,
   264-66; Thomas Dep. at 14; Lewey Dep. at 31-32.

-14-

      10.     Instructions for Steve to prioritize his job above his family. Steve Dep.
               at 370; Thomas Dep. at 15.

*See also* Steve Dep. at Ex. 25 (handwritten notes by Steve and Donna memorializing plaintiffs'
recollections of events).

On August 8, 1995, Reynolds hired Larry Smelley, a private investigator. Smelley
Dep. at 9. Miniclier and Sanderson decided to hire Smelley because they suspected that Steve
was using sick leave to build a house or work at Donna's antique store. *Id.* at 12; Sanderson
at 171-72. On August 11, September 8, and September 28, 1995, days where Steve was
allegedly on FMLA or sick leave, Smelley entered Donna's antique store posing as a customer
and inquired as to Steve's whereabouts. Def.'s Evid. Ex. G. Smelley also observed Steve's
house from the road where he took photographs. *Id.* Smelley memorialized his observations
in a letter to Miniclier dated October 11, 1995. *Id.*

In October 1995, Smelley called a law office in Mobile and spoke with Mary
Chiepalich (Mary Morgan at the time). Chiepalich Dep. at 7. Smelley had worked with
Chiepalich's office on other cases. *Id.* at 6, 9. Smelley tried to verify whether Steve Sprinkle
had attended depositions and trials for another case. *Id.* at 7. When Chiepalich told Smelley
that Steve had not attended a particular trial or deposition, Smelley responded that Steve had
lied to Reynolds about his attendance. *Id.* at 8-9. Chiepalich explained that Steve had been
subpoenaed to testify at "numerous" depositions and at "two to three trials" and that even if he
did not attend a specific trial or deposition, he may have been "on call." *Id.* at 10.

Beginning in February 1996, Steve began suffering from pain in his lower to mid back.
Steve Dep. at 239-41. This pain has persisted in his back, neck and shoulders. *Id.* In March

-15-

1996, he experienced internal bleeding due to a mild case of gastro-reflux and hiatal hernia. *Id.* at 240-43. As a result of these last two conditions, Steve experienced constant nausea and a drop in weight from 236 pounds to 165 pounds. *Id.* at 243. During the diagnosis of these conditions, Steve also learned that he had a benign cyst growing on his liver. *Id.* at 242. Finally, he too has been diagnosed with fibromyalgia. *Id.* at 240.

From October 1996 to January 1997, Steve was laid off as part of a general reduction in force. *Id.* at 245. When Steve returned to work on January 7, 1997, Minicher allegedly told a foreman to tell Steve to put on his safety glasses and safety shoes. *Id.* at 248-49. Steve claims that he went home instead because he had been waiting in the clock line with ten minutes left in his shift and union rules allow him to change out of work gear with ten minutes left. *Id.* At present, Steve continues to be employed by Reynolds. *Id.* at 9-10.

## II. DISCUSSION

### A.    JURISDICTION

As a threshold matter, no federal question remains in the present case by virtue of the plaintiffs' Motion to Dismiss their FMLA claims. However, the court may retain subject matter jurisdiction if the action is between citizens of different states and the amount in controversy exceeds $50,000, exclusive of interest and costs. 28 U.S.C. § 1332 (1994). [11] It is undisputed that the plaintiffs are Alabama residents, Reynolds is a Delaware corporation

---

[11] Effective January 17, 1997, the amount in controversy must exceed $75,000 for a federal district court to have diversity jurisdiction. *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 205, 110 Stat. 3847, 3850 (codified at 28 U.S.C. § 1332 (1997)). Because this action was filed and removed prior to this effective date, the minimum amount in controversy required for this case remains at $50,000. 28 U.S.C. § 1332 (1994).

-16-

with its principal place of business in Virginia, and the amount in controversy exceeds $50,000. *See* Def.'s Notice of Removal at ¶¶ 13-16. Therefore, the court may properly exercise jurisdiction over the remaining Alabama state law claims in the present action.

## B.  SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

-17-

## C.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In their Complaint, Donna and Steve Sprinkle allege that "Reynolds recklessly and/or intentionally refused to allow Steven's requests for leave to care for Donna during her illness" even though "Reynolds knew that Donna was ill, that she required Steven's care and that they both were under severe emotional strain during this time period." Compl. at ¶¶ 20-21. The plaintiffs assert that they suffered "severe mental and emotional distress" as a result of Reynolds' actions. *Id.* at ¶ 22. Because the Sprinkles have failed to set forth sufficient evidence to maintain a claim under Alabama tort law, summary judgment is appropriate for their intentional infliction of emotional distress claim.

To present a jury question for the tort of outrage, or intentional infliction of emotional distress, Alabama law requires a plaintiff to "present sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person should be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993). Actionable conduct must be "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). A plaintiff alleging outrage faces a heavy burden; in only "egregious" cases have the Alabama courts allowed plaintiffs to even present their claims before juries. *See Ex Parte Crawford & Co.*, 693 So. 2d 458, 459 (Ala. 1997). The Alabama Supreme Court has recognized that jury questions existed as to claims of outrage in three categories of cases:

-18-

"1) cases having to do with wrongful conduct in the context of family burials, . . . ; 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim . . . ; and 3) a case involving egregious sexual harassment . . . ."

*Ex Parte Crawford & Co.*, 693 So. 2d at 460 n.1 (quoting *Thomas*, 624 So. 2d at 1044) (internal citations omitted). While this list of three categories may not be exclusive, they certainly form a benchmark for ascertaining what types of conduct are "extreme and outrageous." None of Reynolds's alleged conduct, if true, would fall into the three established categories of outrage cases. Moreover, the alleged conduct falls well short of the benchmark established by these categories for extreme and outrageous conduct.

In support of their outrage claim, plaintiffs rely almost entirely on *Rice v. United Ins. Co. of America*, 465 So. 2d 1100 (1984), which appears to fall outside the three categories in *Ex Parte Crawford*. *See* Pls.' Resp. at 12-14. However, unlike the present case, the court in *Rice* was simply determining whether the plaintiff had failed to state a claim pursuant to ALA. R. CIV. P. 12(b)(6); the court only considered the allegations in the complaint, not the existence of genuine issues of material fact. *Rice*, 465 So. 2d at 1101-02. The court emphasized: "It is *conceivable*, under the facts alleged, that [the plaintiff] can prove a set of facts in support of her claim of intentional infliction of emotional distress." *Id.* at 1102. The present parties have submitted voluminous evidence. After considering this evidence, the court finds that no genuine issues of material fact exist and the plaintiffs cannot, as a matter of law, establish their claim of outrage.

Even if the court uses *Rice* as a guide, the present case remains distinguishable. To coerce the plaintiff into taking disability leave rather than working through her pregnancy, the

-19-

employer in *Rice* allegedly engaged in a far-flung campaign involving the plaintiff's coworkers, husband and clients. *Id.* This conduct culminated in the plaintiff's wrongful termination and miscarriage. *Id.* The court's decision rested largely on the fact that the "defendants' alleged pattern of outrageous acts were direct toward plaintiff when [her supervisor] was likely to know that severe emotional distress could have serious physical repercussions." *Id.* While the alleged conduct in the present case occurred over several months, this conduct does not approach the scope (i.e., no involvement of family members and clients) and severity (i.e., no job loss) of the conduct in *Rice.* Most importantly, Steve Sprinkle was the target of Reynolds's actions. Donna Sprinkle admits, "No one has said anything to me other than Mr. [Dickie] Sanderson saying he didn't have to listen to me [asking for help for her husband on the verge of a breakdown]. But I think digging into my medical history is quite offensive." Donna Dep. at 132-36. Because refusing to listen and "digging" into a person's medical history cannot be reasonably viewed as "atrocious and utterly intolerable in a civilized society," Donna Sprinkle's outrage claim must fail as a matter of law. As for Steve Sprinkle, he did not request leave for his mental health until April 1995. There is no indication that anyone at Reynolds could have reasonably known that the alleged conduct could result in severe emotional distress and that such distress could have serious physical repercussions. Having failed to account for one of the key factors in the *Rice* decision, Steve Sprinkle has, in fact, failed to state a comparable case of outrage.

The plaintiffs also claim that "Reynolds knew that they were actively interfering with [Donna's] access to transportation for her treatment." Pls.' Resp. at 14. The plaintiffs compare their claim to the facts in *Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208

(Ala. 1990). In *McDonald*, the defendants intentionally delayed medical payments in order to coerce the plaintiff into a small lump-sum settlement of his claims. *Id.* at 1210. The allegations in the present case do not rise to the same level of egregiousness as the facts in *McDonald*.[12] The plaintiffs have failed to set forth evidence that Steve's inability to obtain leave would result in missed treatment. Most notably, there is no evidence that Reynolds knew or should have known that Donna could only get treatment with Steve's assistance. Dr. Perry's April 17, 1995 letter fails to state that Steve is a necessary part of Donna's treatments. *See* Steve Dep. at Ex. 13. The Alabama courts have dismissed claims of outrage in cases where defendants have engaged in more direct acts of interference with a plaintiff's medical treatment. For example, the Alabama Supreme Court has upheld dismissal of an outrage claim where a power company terminated service, in violation of state regulations, to an asthmatic who depended upon an electric-powered device for ingestion of medication. *Jackson v. Alabama Power Co.*, 630 So. 2d 439, 440-41 (Ala. 1993).

Finally, when asked to specify "the worst, most serious thing that Reynolds has said or done with respect to you," Steve Sprinkle responded: "[Miniclier's] hollering and screaming and just basically calling me a liar, that everything that I'd done or said or turned in or — was just never good enough." Steve Dep. at 263. Such allegations, as a matter of law, do not give rise to intentional infliction of emotional distress claims. *See Daniel v. Alabama Power Co.*, 555 So. 2d 162, 165 (Ala. 1989) (affirming trial court's judgment that accusations of plaintiff

---

[12] *McDonald*, of course, falls into the established outrage category of insurance agents "employ[ing] heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim . . . ." *Ex Parte Crawford & Co.*, 693 So. 2d at 460 n.1 (quoting *Thomas*, 624 So. 2d at 1044) (internal citations omitted).

"'feigning' his back injury" and challenges to a fistfight were not outrageous conduct);

*Lowman v. Piedmont Executive Shirt Mfg. Co.*, 547 So. 2d 90, 95 (Ala 1989) (affirming

summary judgment of outrage claim where defendant pressured plaintiff to file a fraudulent

disability claim).

Under Alabama law, plaintiffs bear a heavy burden because the tort of outrage is

actionable only "'in the most egregious circumstances.'" *Kilgore v. Thompson & Brock

Management, Inc.*, 93 F.3d 752, 755 (11th Cir. 1996) (quoting *Thomas*, 624 So.2d at 1044).

Whether their claims are viewed separately or collectively, the plaintiffs have failed to set

forth the evidence necessary to satisfy the "high standard with regard to the proof necessary to

substantiate an outrage claim." *See Ex parte Mutual Savings Life Ins. Co.*, 698 So. 2d 772,

775 (Ala. 1997); *Ex parte Crawford & Co.*, 693 So. 2d at 461-62.

### D.    INVASION OF PRIVACY

Under Alabama law, invasion of privacy actually encompasses four distinct "wrongs":

"(1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity
which violates the ordinary decencies; (3) putting the plaintiff in a false but not
necessarily defamatory position in the public eye; and (4) the appropriation of
some element of the plaintiff's personality for a commercial use."

*Patterson v. Augat Wiring Sys., Inc.*, 944 F. Supp. 1509, 1522 (M.D. Ala. 1996) (quoting

*Phillips v. Smalley Maintenance Servs., Inc.*, 435 So.2d 705, 708 (Ala. 1983)). In the present

case, the Complaint alleges that "Reynolds has wrongfully and intentionally intruded into

Steven's and Donna's matters and affairs" because it "undertook to investigate by improper

means Donna' [sic] condition as well as the propriety of his taking family and medical leave."

*See* Compl. at ¶¶ 24-29. The Complaint clearly contemplates an action under the "intrusion

-22-

upon seclusion" theory. In their Response in Opposition to Defendant's Motion for Summary Judgment, the plaintiffs have also alleged additional claims of "holding plaintiff up in a false light and on the basis of exposing embarrassing private facts to unwanted publicity." *See* Pls.' Resp. at 17-18. FED. R. CIV. P. 8(a) requires claims for relief to contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." The Complaint contains no such statement as to any "false light" or "publicity" claims. Because Alabama law with respect to invasion of privacy recognizes four *distinct* wrongs, *see Phillips*, 435 So.2d at 708, the plaintiffs have failed to plead and provide adequate notice of these additional claims. Therefore, the court concludes that plaintiffs have only alleged an intrusion upon seclusion claim and will address no other invasion of privacy claim.

To prevail under an intrusion upon seclusion theory, plaintiffs must show "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649, 651 (Ala. 1986); *accord Hogin v. Cottingham*, 533 So. 2d 525, 530 (Ala. 1988). To determine whether an intrusion is so offensive as to be actionable, a court must consider the following factors "(1) whether the subject of the intrusion is information which is private or entitled to be private; (2) the means of intrusion; (3) the purpose for which the information was obtained. *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1584 (N.D. Ala. 1996) (citing *Hogin*, 533 So. 2d at 531). Though, in the present case, Steve and Donna Sprinkle cite numerous instances where Reynolds allegedly invaded their privacy, these "invasions" are not so offensive as to be actionable.

-23-

First, the plaintiffs claim that Reynolds improperly contacted Dr. Perry in November 1994 to verify Steve's FMLA request in June 1994. *See* Donna Dep. at 106-08. While medical information may be generally entitled to privacy, Reynolds was calling to verify the authenticity of Steve's medical excuse. Both the fax transmittal that was attached to the FMLA request and the letter from Dr. Perry dated June 20, 1994 explicitly invite the reader to call with any questions. Steve Dep. at Exs. 3, 5. Also, a factfinder cannot reasonably conclude that the means employed were improper or offensive. Marty Maxie simply called Dr. Perry's office and asked an employee about a document's authenticity. *See Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985) (noting that an intrusion upon solitude requires an "intrusion must be such as would outrage a person of ordinary sensibilities or cause such a person mental suffering, shame, or humiliation"). Moreover, Maxie's call served the legitimate purpose of verifying Steve's excuse. "[T]he court must balance the employer's legitimate business interest in obtaining the information against the intrusion on the employee's privacy resulting from the disclosure." *Pouncy*, 920 F.Supp. at 1584.

Second, Donna Sprinkle alleges that Reynolds invaded her privacy when it called to verify the frequency of her visits. Donna Dep. at 109-10. Because Steve cited the chronic, recurring nature of Donna's medical conditions as the reason for his frequent absences, the frequency of Donna's medical visits is not information entitled to privacy protection from Reynolds and Reynolds's obtaining this information serves a legitimate purpose. Again, a phone call to a doctor's office without any evidence of deceit or fraud cannot be viewed as an offensive or improper means of obtaining information.

-24-

Third, the Sprinkles claim that Dr. Shanahan's correspondence with Dr. Perry intruded upon their right to privacy. *See* Donna Dep. at 112. As with Reynolds's other contact with Dr. Perry's office, the contact was initiated because Steve was attributing a need to miss work to treatment Donna received from Dr. Perry. In this instance, Dr. Shanahan wrote a letter to Dr. Perry after Steve had submitted an FMLA request based on Donna's condition and offering "Medical records available upon request." While Donna objects to Dr. Shanahan asking about the "specifics of my diseases," Donna Dep. at 109, 112-13, her husband had already disclosed on the form that "[m]y wife suffers from fibromyalgia and interstitial cystitis of the bladder, also chronic pelvic pain caused from indometriosis [sic]." Steve Dep. at Ex. 8. He also noted that her condition is "[i]ncurable" and "[t]hese diseases require frequent trips" to doctors. *Id.* Consequently, information concerning the nature of Donna's medical condition was again not entitled to protection from Reynolds. Dr. Shanahan's letter was by no means an offensive means for obtaining information and the information sought again served the legitimate purpose of verifying the necessity of an employee's absences.

Fourth, the plaintiffs allege that Reynolds intruded upon their solitude or seclusion by engaging a private investigator to confirm that Steve was absent from work for legitimate reasons. It is undisputed Larry Smelley only investigated Steve's whereabouts on days where Steve sought excused absences from work, either for medical or legal reasons. Thus, information concerning Steve's whereabouts were the subject of legitimate inquiry on Reynolds's part. *See Johnson v. Corporate Special Servs., Inc.*, 602 So. 2d 385, 387-88 (Ala. 1992). Furthermore, the means employed by Smelley cannot be reasonably viewed as offensive. Just like any member of

-25-

the public, Smelley walked into Donna's antique store and asked if the store personnel knew "when Steve might be in" and he observed Steve's house from the road. Def.'s Evid. Ex. at G. Additionally, Smelley allegedly called a paralegal in a Mobile law office to verify whether Steve had attended a trial or deposition on a specific date. While Smelley was not always forthright in disclosing his purpose for inquiring about Steve, Smelley cannot be reasonably viewed as pursuing information about Steve in an offensive or improper manner. *See Johnson*, 602 So.2d at 387-88.

Finally, plaintiffs claim that Reynolds intruded upon the private affairs of their married life. *See* Pls.' Resp. at 15-16. Steve alleges that in April 1996, "Mr. Miniclier asked me about my family relationship, how was things going between me and my wife since all this was going on." Steve Dep. at 268. Miniclier supposedly advised Steve that Donna's "sickness wasn't her fault, for [Steve] to back off." *Id.* at 269. While it is within the realm of possibility that a factfinder could conclude that Miniclier's statements concern information that is entitled to privacy and not useful for any legitimate purpose, these statements cannot be reasonably viewed as anything that would "outrage a person of ordinary sensibilities or cause mental suffering, shame, or humiliation." *See Sears, Roebuck & Co.*, 466 So. 2d at 123.

The court concludes that no genuine issue of material fact exists. Reynolds's alleged conduct simply does not, as a matter of law, give rise to a claim of intrusion upon solitude or seclusion. Therefore, Reynolds's Motion for Partial Summary Judgement is due to be granted as to the plaintiffs' invasion of privacy claim.

-26-

## III. CONCLUSION

Based on the foregoing, the court concludes that no genuine issue as to material facts exist as to the plaintiffs' remaining claims. Therefore, the defendant's Motion for Partial Summary Judgment is due to be granted. Plaintiffs' claims of outrage and invasion of privacy, based upon intrusion upon seclusion or solitude, will be dismissed with prejudice. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 31st day of March, 1998.

**SHARON LOVELACE BLACKBURN**
United States District Judge